**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BARRY WILLIAMS,** | : | **Civil No. 3:07-CV-1044** |
| | : | |
| **Plaintiff,** | : | **(Judge Caldwell)** |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **EDWARD KLEM, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

### I.      Statement of Facts and of the Case.

This is a civil rights action brought by Barry Williams, a state inmate, arising out of a June 8, 2005, affray between Williams and correctional staff at SCI-Mahanoy. (Doc. 1.) Williams commenced this action by filing a complaint on June 8, 2007, (Doc. 1), which he subsequently amended on June 4, 2010. (Doc. 51.) Following litigation of various pre-trial motions, the remaining Corrections Defendants in this action are the following former or present employees of the Pennsylvania Department of Corrections at SCI-Mahanoy: Sergeants Piskorik and Dreher and Correctional Officers Andrascavage, Clark, Vance, and Gower.

As to these Defendants, Williams' complaint describes two separate episodes in which he asserts that his constitutional rights were violated. The first episode

allegedly occurred on June 8, 2005, when Williams alleges that was subjected to excessive force on two occasions. First, Williams asserts that Correctional Officer George Piskorik kicked him in the face outside the "chow hall," during an affray between inmates and staff. Williams then alleges that he was assaulted by Defendants Gower, Piskorik, Dreher, and Andrascavage as he was being taken to the prison infirmary immediately following this June 8, 2005, confrontation.

Williams then alleges that he was subjected to additional acts of abuse by Correctional Officers Clark and Vance while in the restricted housing unit at SCI-Mahanoy in July of 2005.  Specifically, Williams alleges that on July 11, 2005, Clark claimed that he had tainted Williams' food, stating to Williams "see if my spit tast[sic] good." (Doc. 1.) According to Williams, Clark further taunted him by turning off the water in the restricted housing unit showers when Williams was bathing. In addition, Williams alleged that Clark came over the loudspeaker in his cell "numerous times taunting me," and insisted that Correctional Officer Vance denied him clean clothing on July 13, 2005, while he was held in the restricted housing unit. As a result of these alleged constitutional infractions Williams seeks compensatory and punitive damages from each Defendant.

On March 14, 2011, the remaining Defendants in this action filed a motion for summary judgment, (Doc. 94), which raised for the first time in this litigation the

Prison Litigation Reform Act's statutory bar that "[n]o action shall be brought with respect to prison conditions under . . . [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1197e(a). Alleging that Williams has not fully exhausted his administrative remedies with respect to these complaints, the Defendants sought summary judgment in this case. (Id.)

        With regard to this administrative exhaustion claim, the pertinent facts are as follows: In 2005 at the time of these events, the Pennsylvania Department of Corrections had established an inmate grievance review system to provide prisoners in its custody with a regular procedure to resolve problems or other issues arising during the course of their confinement. That inmate grievance system policy was set forth in Administrative Directive 804 (DC-ADM 804).  This directive explained the procedures inmates were to use to attempt to resolve their institutional concerns. (Doc. 95, Ex. 1, ¶¶ 2-11.)  Pursuant to DC-ADM 804, any inmate personally affected by a Department or institutional action or by the action of a Department employee may file a grievance after attempting to resolve the issue informally. In the first instance, any inmate grievance must be submitted in writing to the Facility Grievance Coordinator, using the grievance form which is available on all housing units or

blocks. The grievance must be submitted within 15 working days after the event upon which the grievance is based,(id. at ¶3.), and must include a statement of the facts relevant to the claim. The inmate should identify anyone who may have information that could be helpful in resolving the grievance. The inmate must also specifically state any claims he wishes to make.(Id. at ¶4.) Once the grievance is received, the Facility Grievance Coordinator is required to refer it to a staff member not involved in the incident, who reviews the inmate's grievance,  and then makes an appropriate written response to the grievant. ( Id. at ¶5.)

If the inmate is dissatisfied with the initial response, he may appeal that decision to the prison superintendent.( Id. at ¶6.) The superintendent, in turn, provides a written response to the grievant. Any grievant who is not satisfied with the decision of the superintendent may then submit an appeal to the Secretary's Office of Inmate Grievances and Appeals. Only issues raised in both the original grievance and the appeal to the Facility Manager may be appealed at this level. (Id. at ¶8.) The Secretary's Office of Inmate Grievances and Appeals reviews the original grievance and the Initial Review Response, as well as the appeal to the superintendent and the response, along with the appeal to final review. After conducting this comprehensive review, the Secretary's Office of Inmate Grievances and Appeals then issues a

decision and may choose one of a number of dispositions listed in DC-ADM 804. (Id. at ¶9.)

An inmate is not deemed to have exhausted the grievance procedure unless he properly appeals his grievance to the Secretary's Office of Grievances and Appeals. (Id. at ¶10.). If an appeal is remanded to the facility for further review, the superintendent is required to provide a revised response to the inmate. If the inmate is dissatisfied with the response, he must once again appeal to final review within 10 working days of the date of the revised decision. (Id. at ¶11.)

The Department of Corrections has a second policy statement, DCM-001, which also applies here, where an inmate alleges that he has been subjected to physical abuse. (Doc. 101, Exs. B and C.) When the institution receives an inmate allegation of abuse, in addition to processing the grievance, institution staff should coordinate with the Department's Office of Professional Responsibility, which then undertakes the level of inquiry it deems appropriate. Pursuant to DCM-001 at the close of this process OPR has a separate responsibility to report to the inmate in writing regarding the outcome of its inquiry. (Id., Ex. C.)

In Williams' case, the Department of Corrections has recorded four grievances filed by Williams during the time he was housed at SCI-Mahanoy. Two of these grievances were closely related, were filed on successive dates, and dealt directly

5

with the June 8, 2005, incident in which Williams alleged that he was assaulted by staff. Moreover, both of these grievances–Grievance No. 121595 and No. 121596 – were initially processed through the entire administrative grievance cycle to decisions by the Secretary's Office of Inmate Grievances and Appeals.

At the outset, one of these grievances sought intervention by the Department of Corrections to prevent concealment of this alleged abuse. This grievance, Grievance No. 121595, was dated June 26, 2005, and alleged that Williams asked for pictures of his face to be taken on June 9, 2005, after an assault on June 8, 2005, in order to document his injuries. According to Williams' grievance, as of the date of filing the grievance, June 26, 2005, no pictures of his injuries were taken by medical staff. While this particular grievance focused on preservation of evidence of injuries, the grievance mentions an assault by "many CO's", and the grievance clearly protested both the alleged assault as well as efforts to conceal the extent of this alleged abuse. This grievance was initially denied by staff.  Williams then appealed the rejection of Grievance No. 121595 to the Superintendent at SCI-Mahanoy, who upheld the decision to reject the grievance. Williams further appealed the grievance to the Secretary's Office of Inmate Grievances and Appeals who upheld the initial response on February 7, 2006.  Thus, this grievance was undeniably fully exhausted by Williams. (Id.)

At the time that Williams filed this grievance on June 26, 2005, he also alleges that he made abuse allegations to prison officials, something which under Department of Corrections policies would have triggered a concurrent obligation by institution staff and  the Department's Office of Professional Responsibility (OPR) to further look into this matter. (Doc. 101.) Williams alleges that he was told by prison staff on June 26, 2005, that these abuse allegations were being investigated, (Doc. 101, ¶ 6), a report which led him to believe that an OPR inquiry had begun into this incident. Three weeks later, on July 20, 2005, correctional staff confirmed in writing for Williams that some sort of separate investigation was on-going concerning this June 8, 2005, incident, informing Williams that this incident was "currently under investigation." ( Doc. 101, p.139.) In fact, there was an internal investigation conducted by prison staff regarding the June 8, 2005, use of force incident, an investigation which examined the candor and conduct of numerous correctional staff. (Doc. 93.) Thus, Williams was well-justified in believing in the summer of 2005 that some form of inquiry into this alleged abuse was being undertaken.

At the same time that Williams was pursuing and exhausting this grievance he filed a separate, but closely related grievance, Grievance No. 121596. In this sequentially numbered and related grievance, dated June 27, 2005, Williams alleged that he was "assaulted on 6-8-05 by many C.O.s" and one of his assailants,

Correctional Officer Gower, continued to be his block officer. This grievance was initially rejected by staff and Williams appealed the rejection of the grievance to the Superintendent at SCI-Mahanoy, who upheld the decision to reject that grievance. Williams then further appealed the grievance to the Secretary's Office of Inmate Grievances and Appeals which remanded the matter to SCI-Mahanoy for further review.

This remand decision, however, was limited to addressing allegations regarding Officer Gower. Thus, it did not speak to Williams' other claims that "many C.O.'s" assaulted him, a matter that Williams had previously been informed was the subject of a separate investigation by the Department of Corrections. On September 14, 2005, a revised initial response was issued at SCI-Mahanoy, rejecting this grievance as to Gower only. Notably absent from this response was any mention of the other correctional officers who allegedly assaulted Williams. (Doc. 95, Ex. C.) Moreover, at the time that this decision was made on remand, Williams had been moved from SCI-Mahanoy and his concern about being housed in a unit overseen by Officer Gower– the only concern expressly addressed in this remand– was now moot. Finally, while Williams did not further appeal this decision, he asserts that he took no further action because he had fully exhausted his initial round of administrative remedies on this claim, he believed his complaints regarding Officer Gower were moot as a result

of his transfer from SCI- Mahanoy, and he remained under the impression both from oral and written communications by corrections staff, that there was an on-going investigation looking into these broader allegations of physical abuse of Williams by staff. (Doc. 101.)

On July 13, 2005, Williams filed a third grievance, Grievance No. 123390, which dealt with events at the prison in July of 2005 and alleged that on July 11, 2005, Officer Clark delivered Williams' lunch and stated "see if my spit tast[sic] good." Furthermore, according to Williams, on July 13, 2005, Clark turned off the water while Williams was in the prison shower and taunted Williams over the intercom. Williams also alleged in this grievance that Officer Vance refused to give him a clean jumpsuit on July 13, 2005. On July 20, 2005, prison staff issued an initial response to Williams rejecting the grievance. Williams then fully exhausted his appellate rights with respect to this particular grievance, appealing the denial of the grievance to the prison superintendent and to the Secretary's Office of Inmate Grievances and Appeals, who both rejected Williams' claims. (Doc. 98-1, ¶ 14.)

It is against this factual background that the instant motion for summary judgment is lodged. This motion has been fully briefed by the parties, and is now ripe for resolution. For the reasons set forth below, it is recommended that, to the extent that the Defendants attempt to raise the bar of failure to exhaust administrative

remedies, this motion should be denied. However, to the extent that the Defendants contend that Officer Vance's conduct, which consists of nothing more than an alleged failure to deliver a clean jumpsuit to Williams on a single occasion, fails to state a constitutional claim, we agree that this conduct does not rise to the level of a constitutional violation. Similarly, we conclude that Williams' claims of verbal abuse by Officer Clark do not state an actionable constitutional claim, although Williams' assertion that Officer Clark threatened to taint his food by spitting in it does state a claim upon which relief may be granted. Therefore, it is recommended that these claims and Defendants be dismissed from this case.

## III.   **Discussion**

### A.   **Summary Judgment-Standard of Review**

The Defendants have moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Through summary adjudication a court is empowered to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a trial would be "an empty and unnecessary formality." Univac Dental Co. v. Dentsply

Int'l, Inc., No. 07-0493, 2010 U.S. Dist. LEXIS 31615, at *4 (M.D. Pa. Mar. 31, 2010).  The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence.

11

<u>Anderson</u>, 477 U.S. at 249.   There must be more than a scintilla of evidence
supporting the nonmoving party and more than some metaphysical doubt as to the
material facts.  <u>Id.</u> at 252; <u>see</u> <u>also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>,
475 U.S. 574, 586 (1986).  In making this determination, the court must "consider all
evidence in the light most favorable to the party opposing the motion."  <u>A.W. v.</u>
<u>Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

### B.   Administrative Exhaustion Rules Do Not Preclude Williams from Pursuing These Claims

The Defendants first urge the Court to grant summary judgment on the
Plaintiff's claims because Williams allegedly failed to exhaust the administrative
remedies available to him under Department of Corrections procedures with respect
to the various contentions leveled against correctional staff. This alleged  failure to
timely pursue these administrative remedies may have substantive significance for the
Plaintiff since the Prison Litigation Reform Act provides that "[n]o action shall be
brought with respect to prison conditions under . . . [42 U.S.C. § 1983], or any other
Federal law, by a prisoner confined in any jail, prison, or other correctional facility
until such administrative remedies as are available are exhausted."  42 U.S.C. §
1197e(a). Section 1997e's exhaustion requirement applies to a wide-range of inmate
complaints, including damages complaints like those made by Jones grounded in

alleged violations of the Eighth Amendment.  See Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004); Booth v. Churner, 206 F.3d 289 (3d Cir. 2000).  While this exhaustion requirement is not a jurisdictional bar to litigation, this requirement is strictly enforced by the courts.  This rigorous enforcement is mandated by a fundamental recognition that § 1997e's exhaustion requirement promotes important public policies. As the United States Court of Appeals for the Third Circuit has noted:

> Courts have recognized myriad policy considerations in favor of exhaustion requirements. They include (1) avoiding premature interruption of the administrative process and giving the agency a chance to discover and correct its own errors; (2) conserving scarce judicial resources, since the complaining party may be successful in vindicating his rights in the administrative process and the courts may never have to intervene; and (3) improving the efficacy of the administrative process. Each of these policies, which Congress seems to have had in mind in enacting the PLRA, is advanced by the across-the-board, mandatory exhaustion requirement in § 1997e(a). ... [A] a comprehensive exhaustion requirement better serves the policy of granting an agency the "opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court." Moreover, "even if the complaining prisoner seeks only money damages, the prisoner may be successful in having the [prison] halt the infringing practice" or fashion some other remedy, such as returning personal property, reforming personal property policies, firing an abusive prison guard, or creating a better screening process for hiring such guards. And when a prisoner obtains some measure of affirmative relief, he may elect not to pursue his claim for damages. In either case, local actors are given the chance to address local problems, and at the very least, the time frame for the prisoner's damages is frozen or the isolated acts of abuse are prevented from recurring. An across-the-board exhaustion requirement also promotes judicial efficiency. . . . Moreover, even if only a small percentage of cases settle, the federal courts are

saved the time normally spent hearing such actions and multiple appeals thereto. . . . In cases in which inmate-plaintiffs exhaust their remedies in the administrative process and continue to pursue their claims in federal court, there is still much to be gained. The administrative process can serve to create a record for subsequent proceedings, it can be used to help focus and clarify poorly pled or confusing claims, and it forces the prison to justify or explain its internal procedures. All of these functions help courts navigate the sea of prisoner litigation in a manner that affords a fair hearing to all claims.

Nyhuis v. Reno, 204 F.3d 65, 75-76 (3d Cir. 2000)(citations omitted).

Because of the important policies fostered by this exhaustion requirement, it has been held that there is no futility exception to § 1997e's exhaustion requirement. Id. Instead, courts have typically required across-the-board administrative exhaustion by inmate plaintiffs who seek to pursue claims in federal court.

Moreover, courts have also imposed a procedural default component on this exhaustion requirement, holding that inmates must fully satisfy the administrative requirements of the inmate grievance process before proceeding into federal court. Spruill v. Gillis, 372 F.3d 218 (3d Cir. 2004). Applying this procedural default standard to § 1997e's exhaustion requirement, courts have concluded that inmates who fail to fully, or timely, complete the prison grievance process are barred from subsequently litigating claims in federal court. See, e.g., Booth v. Churner, 206 F.3d 289 (3d Cir. 2000); Bolla v. Strickland, 304 F. App'x 22 (3d Cir. 2008); Jetter v.

Beard, 183 F. App'x 178 (3d Cir. 2006). Applying this procedural default component, an inmate cannot excuse a failure to timely comply with these grievance procedures by simply claiming that his efforts constituted "substantial compliance" with this statutory exhaustion requirement. Harris v. Armstrong, 149 F.App'x 58, 59 (3d Cir. 2005). Nor can an inmate avoid this exhaustion requirement by merely alleging that the Department of Corrections policies were not clearly explained to him. Davis v. Warman, 49 F. App'x 365, 368 (3d Cir. 2002). Thus, an inmate's confusion regarding these grievances procedures does not, standing alone, excuse a failure to exhaust. Casey v. Smith, 71 F. App'x 916 (3d Cir. 2003). Moreover, an inmate cannot cite to alleged staff impediments to grieving a matter as grounds for excusing a failure to exhaust, if it also appears that the prisoner did not pursue a proper grievance once those impediments were removed. Oliver v. Moore, 145 F. App'x 731 (3d Cir. 2005)(failure to exhaust not excused if, after staff allegedly ceased efforts to impede grievance, prisoner failed to follow through on grievance).

This broad rule, however, admits of one exception, an exception with potential application here. If the actions of prison officials in some fashion contributed to inmate's procedural default on a grievance, the inmate will not be held to strict compliance with this exhaustion requirement. See Camp v. Brennan, 219 F.3d 279 (3d Cir. 2000). However, case law recognizes a clear "reluctance to invoke equitable

15

reasons to excuse [an inmate's] failure to exhaust as the statute requires." <u>Davis v. Warman</u>, 49 F.App'x 365, 368 (3d Cir. 2002). Thus, an inmate's failure to exhaust will only be excused "under certain limited circumstances," <u>Harris v. Armstrong</u>, 149 F. App'x 58, 59 (3d Cir. 2005), and an inmate can defeat a claim of failure to exhaust only by showing "he was misled or that there was some extraordinary reason he was prevented from complying with the statutory mandate." <u>Davis v. Warman</u>, <u>supra</u>, 49 F. App'x at 368.

One such well-recognized "extraordinary reason" which may excuse a possible procedural default by an inmate is presented in this case. Courts have long agreed that, where the actions of prisons officials create a genuine and good-faith belief by an inmate that some further investigation is on-going into his complaints, alleged procedural defaults by the prisoner should be excused.  <u>See, e.g.</u>, <u>Brown v. Croak</u>, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); <u>Camp v. Brennan</u>, 219 F.3d 279, 281 (3d Cir. 2000) (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and uncontradicted correctional officers impeded filing of grievance). In such instances, it has been held that where there are factual questions concerning the extent to which an inmate was

led to believe that there was an on-going prison investigation into his complaints, summary judgment in favor of the defendants clearly is not appropriate. See, e.g., Knauss v. Shannon, No. 08-1698, 2010 WL 569829 (M.D. Pa. Feb. 12, 2010); Born v. Monmouth County Correctional Institution, No. 07-3771, 2008 WL 4056313 (D.N.J. Aug. 28, 2008).

Judged in light of these legal standards, to the extent that the Defendants' motion for summary judgment asserts a failure to properly exhaust administrative remedies, this defense fails for at least two reasons: First, with respect to at least two of the administrative grievances lodged by Williams, Grievance No. 121595 and No. 123390, it is clear that Williams, in fact, fully exhausted his administrative remedies. In both of these instances, Williams appealed these grievances throughout the administrative process to final denials of the grievances on their merits. Thus, there is nothing more that Williams could have done under the existing grievance system with respect to either of these grievances, and the Defendants apparently concede that these two grievances were fully exhausted.

As to the remaining grievance lodged by Williams regarding the June 8, 2005, staff assault allegedly committed upon him, Grievance No. 121596, we find that disputed factual issues preclude summary judgment for the Defendants on administrative exhaustion grounds. With respect to this grievance, which was filed

17

on June 27, 2005, Williams has alleged that when he filed this grievance he also made abuse allegations, something which under Department of Corrections policies would have triggered a concurrent obligation by institution staff and the Department's Office of Professional Responsibility (OPR) to look into this matter. (Doc. 101.) Williams further alleges that he was told by prison staff on June 26, 2005, that these abuse allegations were being investigated, (Doc. 101) ¶ 6), a report which led him to believe that an OPR inquiry had begun in this matter. Three weeks later, on July 20, 2005, correctional staff confirmed in writing for Williams that there was some separate investigation on-going concerning this June 8, 2005, incident, informing Williams that this incident was "currently under investigation." ( Doc. 101, p.139.) Indeed, it is undisputed that there was actually an internal investigation conducted by prison staff regarding the June 8, 2005, use of force incident which examined both the candor and conduct of numerous correctional staff. (Doc. 93.) Moreover, Williams made substantial efforts to fully grieve this particular grievance. In fact, with respect to Grievance No. 121596, when this grievance was initially rejected by staff Williams timely appealed the rejection of the grievance to the Superintendent at SCI-Mahanoy. After the superintendent upheld the decision to reject that grievance, Williams then further appealed the grievance to the Secretary's Office of Inmate Grievances and Appeals which remanded the matter to SCI-Mahanoy for

further review. This remand decision, however, was limited to addressing allegations regarding Officer Gower. Thus, the remand decision did not address Williams' broader claims of staff abuse, claims that Williams had been informed in writing were the subject of a separate investigation. On September 14, 2005, a revised initial response was issued rejecting the grievance as to Gower only. Notably absent from this response was any mention of the other correctional officers who allegedly assaulted Williams. (Doc. 95, Ex. C.)

At the time that this decision was made on remand, Williams had been moved from SCI-Mahanoy and his concern about being housed in a unit overseen by Officer Gower– the only concern expressly addressed in this remand– was now moot. Finally, while Williams did not further appeal this decision, he asserts that he took no further action because he had fully exhausted his initial round of administrative remedies, he believed his complaints regarding Officer Gower were moot as a result of his transfer from SCI-Mahanoy, and he remained under the impression both from oral and written communications by corrections staff, that there was an on-going investigation looking into these broader allegations of physical abuse of Williams by staff. (Doc. 101.)

On these facts, we find that the actions of prisons officials create a factual dispute concerning whether Williams had a genuine and good-faith belief that some further investigation was on-going into his complaints, an extraordinary occurrence

which would excuse any alleged procedural defaults by this inmate.  See e.g., Brown v. Croak, 312 F.3d 109, 110 (3d Cir. 2002) (assuming that prisoner with failure to protect claim is entitled to rely on instruction by prison officials to wait for outcome of internal security investigation before filing grievance); Camp v. Brennan, 219 F.3d 279, 281 (3d Cir.2000) (exhaustion requirement met where Office of Professional Responsibility fully examined merits of excessive force claim and uncontradicted correctional officers impeded filing of grievance). Moreover, in a case such as this, where there remain factual questions concerning the extent to which an inmate was led to believe that there was an on-going OPR investigation into his complaints, summary judgment in favor of the Defendants on administrative exhaustion grounds clearly is not appropriate. See, e.g., Knauss v. Shannon, No. 08-1698, 2010 WL 569829 (M.D. Pa. Feb. 12, 2010); Born v. Monmouth County Correctional Institution, No. 07-3771, 2008 WL 4056313 (D.N.J. Aug. 28, 2008). Therefore, this motion for summary judgment on administrative exhaustion grounds should be denied.[1]

---

[1]Indeed, it is worthwhile noting that defense counsel, highly experienced and sophisticated trial counsel in this field, did not perceive this potential exhaustion issue for more than 3 ½ years after this litigation commenced, a factor which also suggests that a *pro se* inmate could not be expected to recognize in this setting, where he had pursued these three grievances to decisions by the Secretary's Office of Inmate Grievances and Appeals, that he had not yet fully exhausted these remedies.

**C.**   **Williams Has Failed to State a Constitutional Claim Against Defendant Vance and has Failed to State Any Constitutional Claims Relating to Alleged Verbal Abuse**

While we find that the Defendants' efforts to assert the PLRA's administrative exhaustion requirement as a bar to this lawsuit are unavailing, we recommend that one Defendant, Correctional Officer Vance, be dismissed from this lawsuit. As to this Defendant, the sole allegation made by Williams is that Vance failed to deliver a clean jumpsuit to him on July 13, 2005.

Such an assertion, in isolation, simply does not amount to a constitutional infraction. Williams  faces an exacting burden in advancing an Eighth Amendment claim against this prison official in his individual capacity since such a claim requires a specific showing of intent in order to demonstrate deliberate indifference, the legal touchstone for any Eighth Amendment claim. Whether cast as an excessive force claim, or couched as a claim of deliberate indifference to an inmate's safety, such Eighth Amendment claims require proof of both serious misconduct and a culpable state of mind. Thus, in an excessive force context, where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley[v. Albers, 475

21

U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson v. McMillian</u>, 503 U.S. 1, 6-7 (1992). The issue of whether excessive force was used is one which, in proper circumstances, can be determined as a matter of law. In such cases, summary judgment is only appropriate when "it appears that the evidence, viewed in the light most favorable to the plaintiff, [not] will support a reliable inference of wantonness in the infliction of pain." <u>Brooks v. Kyler</u>, 204 F.3d 102, 106 (3d Cir. 2000) (quoting <u>Whitley</u>, 475 U.S. at 322).

Similarly, proof of a culpable subjective intent is a critical component of an Eighth Amendment deliberate indifference claim. The leading case in the Third Circuit addressing deliberate indifference in this prison context is found in <u>Beers-Capitol v. Whetzel</u>, 256 F.3d 120 (3d Cir. 2001). In <u>Beers-Capitol,</u> the Third Circuit explained the basic requirements of a claim brought against a prison official under the Eighth Amendment as follows:

> An Eighth Amendment claim against a prison official must meet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind."

<u>Id.</u> at 125 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)).  Furthermore, in cases involving prison safety or prison conditions, the relevant state of mind "is one

22

of 'deliberate indifference' to inmate health or safety." <u>Id.</u>   This deliberate

indifference standard "is a subjective standard under <u>Farmer</u> – the prison official-

defendant must actually have known or been aware of the excessive risk to inmate

safety." <u>Id.</u> Thus, " '[d]eliberate indifference can be shown when a prison official

*knows of and disregards* an excessive risk to inmate health or safety' <u>Hamilton v.

Leavy</u>, 117 F.3d 742, 747 (3d Cir. 1997) (quotation marks omitted)(emphasis added).

Accordingly,   "to survive summary judgment on an Eighth Amendment claim

asserted under 42 U.S.C. § 1983, a plaintiff is required to produce sufficient evidence

of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to

that risk; and (3) causation." <u>Davis v. Williams</u>, 354 F. App'x 603, 605-606 (3d Cir.

2009). Here, the alleged failure to deliver clean laundry to Williams on one occasion

in July of 2005 simply does not state a claim describing a harm of sufficient gravity,

or acts undertaken with a sufficiently grave state of mind, to demonstrate that Officer

Vance engaged in "cruel and unusual" punishment in violation of the Eighth

Amendment. Therefore, these allegations against Officer Vance fail as an Eighth

Amendment claim.

Nor can Williams sustain a claim against Officer Vance on the speculative

theory that this isolated refusal to deliver clean laundry to him on this single date rose

to the level of retaliation against Williams for the exercise of his First Amendment

rights. A prisoner claiming that prison officials have retaliated against him for exercising his constitutional rights must first prove the following three elements: (1) the conduct in which he engaged was constitutionally protected; (2) he suffered adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial motivating factor in the defendants' conduct. Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002). With respect to the obligation to demonstrate that he suffered an adverse action, a plaintiff must demonstrate that he suffered action that "was sufficient to deter a person of ordinary firmness from exercising his rights." Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000).

The third essential element to a retaliation claim is that there be a causal link between the exercise of a constitutional right and the adverse action taken against the prisoner. Rauser, 241 F.3d at 333-34. To establish this third, and crucial, component to a constitutional retaliation claim, causation, the inmate must make an exacting showing. In this setting:

> To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. See Krouse v. American Sterilizer Co., 126 F.3d 494, 503-04 (3d Cir.1997); Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir.1997). In the absence of that proof the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of the fact should infer

causation. <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 281 (3d Cir.2000).

<u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007).

Moreover, when examining these causation issues, we are specifically admonished that:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

<u>Id.</u> at 267-68.

Mindful of these concerns, courts have in the past carefully scrutinized inmate claims of retaliation premised solely on circumstantial proof of a temporal proximity

between the plaintiff's conduct and allegedly retaliatory acts. In this case, our review of Williams' allegations and evidence does not permit a reasonable inference of a retaliatory motive on the part of Officer Vance when he allegedly denied Williams clean laundry on one occasion in July 2005. Moreover, we find that the Plaintiff has not shown that this alleged action "was sufficient to deter a person of ordinary firmness from exercising his rights," Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000), another essential element of a retaliation claim. Therefore, the complaint as to Officer Vance should be dismissed.[2]

---

[2]The defendants also seek dismissal of the claims against Officer Clark, arguing that those claims also fail on their merits. However, the claims against Clark include a claim that Clark told Williams that he was tainting Williams' food by spitting in it, conduct which would state an arguable Eighth Amendment claim. See Escobar v. Reid, 668 F.Supp.2d 1260 (D. Col. 2009); Young v. Madden, No. 03-5432, 2006 WL 456274 (E.D. Pa. Feb. 23, 2006). Therefore, as to Officer Clark, it is not recommended that the complaint be dismissed on this Eighth Amendment claim. However, to the extent that Williams complains that Clark harangued him over the prison loudspeaker on occasion, this type of verbal behavior does not rise to the level fo a constitutional violation. See e.g., Alexander v. Forr, No. 04-370, 2006 WL 2796412, at *4 (M.D.Pa. Sept.27, 2006) ("Verbal abuse or threats do not constitute the type of adverse action sufficient to support a retaliation claim."); Bartelli v. Bleich, No. 04-0899, 2005 WL 2347235, at *3 (M.D.Pa. Sept. 26, 2005) ("[M]ere verbal threats cannot be viewed as an 'adverse action' sufficient to deter a person of ordinary firmness from exercising his First Amendment rights."); see also Reid v. Wakefield, No. 06-249, 2007 WL 954179, at *4 (W.D.Pa. Mar. 28, 2007) ("Verbal threats, whether acted upon or not, simply will not be sufficient to state a First Amendment claim."); Gay v. City of Phila., No. 03-5358, 2005 WL 1844407, at *5 (E.D.Pa. Aug.2, 2005) ("[I]t is well established that verbal abuse or threats alone do not state a constitutional claim."). Therefore it is recommended that any claims premised solely on Officer

_____

Clark's verbal taunting, as opposed to his threats to taint Williams' food, should be  dismissed .

27

## III.   **Recommendation**

Accordingly, for the foregoing reasons, IT IS RECOMMENDED that the

Defendants' motion for summary judgment (Doc. 94) be GRANTED, in part, and

DENIED in part as follows:

1.     The motion should be GRANTED as to Defendant Vance and as to the

claims against Defendant Clark based solely upon alleged verbal taunts

which do not include claims of tainting food .

2.     The motion should be DENIED as to all other Defendants and claims.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within fourteen
(14) days after being served with a copy thereof. Such party shall file
with the clerk of court, and serve on the magistrate judge and all parties,
written objections which shall specifically identify the portions of the
proposed findings, recommendations or report to which objection is
made and the basis for such objections. The briefing requirements set
forth in Local Rule 72.2 shall apply. A judge shall make a de novo
determination of those portions of the report or specified  proposed
findings or recommendations to which objection is made and may
accept, reject, or modify, in whole or in part, the findings or
recommendations made by the magistrate judge. The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the
magistrate judge, making his or her own determination on the basis of
that record. The judge may also receive further evidence, recall

witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 10th day of May, 2011.

***<u>S/Martin C. Carlson</u>***
Martin C. Carlson
United States Magistrate Judge
